**UNITED STATES of America, Plaintiff,**

v.

**The RAINBOW FAMILY, also known as the Rainbow Nation, and others, Defendants.**

**Civ. A. No. L–88–68–CA.**

United States District Court,
E.D. Texas,
Tyler Division.

June 23, 1988.

Bob Wortham, Steven Mason, Asst. U.S. Atty., Tyler, Tex., O. Kenneth Dodd, U.S. Atty., Beaumont, Tex., for plaintiff.

Larry R. Daves, Daves, Hahn & Levy, Tyler, Tex., for Principle, "Electric Ed", Holley Lynn, Barry Adams, Michael John, Water Singing On The Rocks, Diane Temperance, Little White Owl and Spring Council.

Barry Adams, Missoula, Mont., pro se.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

This memorandum opinion addresses the demand of the plaintiff, the United States of America, for permanent injunctive relief against the defendants. As explained below, the demand will be granted in part; and a permanent injunction will be entered enjoining the defendants, in the class certified herein, from meeting, gathering, or assembling upon any National Forest System lands in the State of Texas, if they fail to comply with certain conditions necessary to protect the public health and safety.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On May 6, 1988, the government filed its original complaint, demanding a permanent injunction, as well as a temporary restraining order and a preliminary injunction. The complaint named a number of defendants, including the Rainbow Family (also termed the Rainbow Nation, the Rainbow Family of Living Light, and the Gathering of the Tribes), the Rainbow Family Vision Council, the Rainbow Family Tribal Council, and the Rainbow Family Scout Council. These defendants comprise one form or another of a loosely-knit but identifiable association of persons who, for want of a better name, shall be referred to herein as the Rainbow Family. Among the activities of the Rainbow Family are various meetings, "councils," or gatherings, often held in the United States National Forests, for the purposes of "celebrating life," worship, expressing ideas and values, and associating with like-minded persons. The largest of these is the Rainbow Family Summer Gathering, which is held annually and has attracted as many as 20,000 people in the past. The Summer Gatherings typically begin in late May or June of each year, building to a climax over the July 4th holiday weekend. The 1988 Rainbow Family Summer Gathering has been set to take place in a National Forest in the State of Texas, and is the subject of this litigation.

Several individual defendants are also named in the complaint, all of whom are purportedly associated with one or more of the Rainbow Family defendants listed above. Additionally, in a first amended complaint filed May 13, 1988, the government has moved for certification of a defendant class, which would include Rainbow Family members and all others who might seek to attend the 1988 Summer Gathering.

The original complaint alleged that the defendants intend to conduct the 1988 Summer Gathering without obtaining a "special use permit" in advance, as required by U.S. Forest Service regulations. The complaint further alleged that, preceding the Summer Gathering, smaller gatherings or "seed camps" would be instituted by Rainbow Family members, and would grow into the larger Summer Gathering. The plaintiff contends that such gatherings pose threats of irreparable harm to public health and safety, and to Forest Service lands and property, and that they will entail numerous instances of offensive or criminal conduct, such as public nudity, public disturbances, or use of illicit drugs.

The original complaint asserted four causes of action, based upon, respectively: violation of the Forest Service special use permit regulations, found at 36 C.F.R. Part 251 (1987); violation of the Texas Mass Gatherings Act, Tex.Rev.Civ.Stat.Anno., art. 9002 (Vernon's 1987), which requires permits from a county judge, for gatherings of more than 5,000 persons outside of an incorporated municipality; and the prospective creation of an alleged public nuisance under federal and state law. By way of relief, the government originally demanded that the defendants be restrained and enjoined from attending, participating, or preparing in any way for any gathering of twenty-five or more persons in the National Forests of the State of Texas, unless and until they had applied for and obtained a special use permit from the U.S. Forest Service.[1]

Pursuant to 28 U.S.C. § 636, the Honorable J. Michael Bradford, United States Magistrate, was designated to conduct hearings and to prepare recommendations for the disposition of both the application for a temporary restraining order and the demand for a preliminary injunction. A hearing on the application for temporary restraining order was conducted in Lufkin, Texas, on May 10, 1988, at which various individual defendants appeared, and the government presented evidence in support of its allegations. In a report delivered the same date, the magistrate recommended that the application for temporary restraining order be granted, primarily in view of alleged public health dangers and the difficulties authorities might have in controlling a gathering on National Forest lands, once substantial numbers of participants had arrived. The magistrate's report and recommendations were adopted by the court, and a temporary restraining order was issued on May 12, 1988, enjoining the defendants from attending, conducting, or participating in any way in any meeting of twenty-five or more persons in any National Forest in the State of Texas, without first obtaining a special use permit from the U.S. Forest Service. *See* Temporary Restraining Order, May 12, 1988, at 5–6.

Magistrate Bradford then conducted two days of further evidentiary hearings on the plaintiff's motion for preliminary injunction, while the temporary restraining order was still in effect. The magistrate had been instructed, in the order adopting his recommendation, to take evidence and make recommendations concerning various objections raised by the defendants to the jurisdiction of the court and to the legality of the special use permit regulations. In a report dated May 27, 1988, the magistrate found that the Rainbow Family could be sued as an unincorporated association under Federal Rule of Civil Procedure 17(b), and that the prerequisites to certification of a defendant class, under Federal Rule of

---

1. The government also demanded affirmative injunctive relief, requiring the defendants to publicize the terms of the injunction. It further prayed for "such other and further relief to which Plaintiff may be entitled," without, however, more particularly specifying what such relief might be.

Civil Procedure 23(a), were present. The magistrate further found that the Forest Service's special use permit regulations were lawfully adopted, would be applicable to the defendants, and would not (with the exception of one provision of the regulations) impermissibly burden the defendants' constitutional rights under the First Amendment. He, therefore, recommended that the preliminary injunction be issued. *See* Report and Recommendation of United States Magistrate, submitted May 27, 1988, at 12–13, 18–22.

In an order entered June 1, 1988, 695 F.Supp. 294, this court adopted the magistrate's recommendations in part, and rejected them in part, and denied the government's motion for a preliminary injunction. The magistrate's recommendations that the Rainbow Family could be sued as an unincorporated association, and that the prerequisites to certification of a defendant class had been satisfied, were adopted over the defendants' objections. However, it was held that the Forest Service's special use permit regulations were not valid, insofar as recently promulgated revisions to the regulations were concerned; and, further, that the existing permit regulations—to the extent that they single out expressive activity protected under the First Amendment, and do not provide clear and precise standards governing the issuance or denial of a permit for such activity—impermissibly burden the defendants' rights to freedom of speech, worship, and association. The permit regulations having been found invalid, the preliminary injunction sought by the government was denied. *See* Order at 314.

After the plaintiff's motion for preliminary injunction was denied, the government filed its second amended complaint, seeking alternative forms of permanent injunctive relief to that originally demanded. In addition to an injunction barring the defendants from gathering in the National Forests of the State of Texas unless they first secured a special use permit, the government now demands that the defendants also "be enjoined from or ordered to perform such specific acts or omissions as recommended by the Texas Department of Health and the Texas Department of Public Safety and the United States Forest Service to protect the public health and safety and environment and resources of the National Forests, and those set out in the Texas Mass Gathering Act and other state statutes." Second Amended Complaint, at 3. Further, the government demands that the defendants be "enjoined not to prevent or in any way obstruct free and unencumbered and unrestricted access to the common areas at and to the gathering site, and free and unencumbered and unrestricted ingress and egress, to officials of the Forest Service and the Texas Department of Health and those with them," and for such further relief, "general or special, in law and in equity, to which Plaintiff may be entitled." *Id.*

The individual defendants have answered the complaints and have filed counterclaims against the government, demanding injunctive and declaratory relief. The counterclaims allege that the permit regulations are unconstitutional; that the government has sought to suppress the defendants' exercise of First Amendment rights out of hostility to the Rainbow Family or to the content of their views; and that the Forest Service has unlawfully videotaped and otherwise harassed the defendants.

A hearing to consider the grounds alleged as the bases for the final injunctive relief urged by the government was conducted in Tyler, Texas, from June 13, 1988, to June 16, 1988. Testimony, videotapes of prior gatherings, and other evidence were submitted by the parties. The substance of the evidence presented at the hearing is set forth in the findings of fact contained herein.

## II. CERTIFICATION OF DEFENDANT CLASS

Rule 23 of the Federal Rules of Civil Procedure requires that two separate examinations must be made to determine whether a suit is properly maintainable as a class action. First, the action must meet each of the four prerequisites to class certification provided under Rule 23(a), that is:

the proposed class is so numerous that joinder of all members is impracticable; there are questions of law or fact common to the class; the claims or defenses of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); J. Moore, *Moore's Federal Practice,* ¶ 23.03 (1987). Second, the action must fit within one or more of the three categories of class actions specified under Rule 23(b).

As noted above, Magistrate Bradford received evidence and found that each of the Rule 23(a) prerequisites to a class action has been met, and his recommendation has been adopted by the court. *See* Order at 298–299. The numerosity element is clearly present in this instance—the defendants themselves have estimated that from 5,000, to as many as 100,000 persons, may attend the 1988 Summer Gathering. The typicality and commonality requirements are also satisfied, as all persons who may seek to attend the gathering in Texas would be subject to the same legal requirements asserted by the government, would jointly pose an alleged danger of public nuisance, and would have available to them the same constitutional and other defenses raised by the individual defendants. Moreover, the individually-named defendants, many of whom have appeared in these proceedings and have otherwise taken active roles in representing the Rainbow Family in this litigation, will be able to fairly and adequately protect the interests of the class. *See* Order at 299. Finally, counsel for the individual defendants, Larry Daves, Esquire, is an able civil rights lawyer with considerable experience in class action litigation, and can effectively assist the class representatives in conducting the defense of this civil action. Therefore, all the requirements of Rule 23(a) are met.

The evidence presented before Magistrate Bradford and at the hearing on the motion for final injunction makes it apparent that certification of a defendant class pursuant to Rule 23(b)(2) is particularly appropriate. Rule 23(b)(2) provides:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\*　　\*　　\*　　\*　　\*　　\*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; ....

■ Although the language of Rule 23(b)(2), if taken literally, would appear to bar certification of a *defendant* class, it has been held an appropriate mechanism for such certification in circumstances similar to these, where the uniform conduct of multiple defendants is challenged and solely injunctive relief is requested. *See, e.g., Zablocki v. Redhail,* 434 U.S. 374, 379 & n. 4, 98 S.Ct. 673, 677 & n. 4, 54 L.Ed.2d 618 (1978); *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *Doss v. Long,* 93 F.R.D. 112 (N.D.Ga.1981). *See also* H. Newberg, *Newberg on Class Actions,* § 4.18 (2d ed. 1985) (permitting defendant classes is a "more flexible approach" and is "more preferable to the restrictive one, because in all probability, the Rules Advisory Committee never focused on how the amended rule would be applied when a defendant class suit is sought"); J. Moore, *Moore's Federal Practice,* ¶ 23.40[6] (1987). Moreover, class certification under Rule 23(b)(2) is also appropriate when counterclaims generally applicable to the proposed class have been alleged, as here, where injunctive and declaratory relief has been demanded against the government, for its alleged actions in harassing the defendants and in seeking to exclude them from the National Forests of Texas. *See Slaughter v. Levine,* 598 F.Supp. 1035 (D.Minn.1984); *American Finance System v. Harlow,* 65 F.R.D. 572 (D.Md.1974).

The uncontested evidence shows that the defendants have, thus far, failed or refused to apply for a special use permit before gathering on National Forest lands in Texas. Further, although strongly contested

by the defendants, the evidence also shows that a gathering of large numbers of persons, under the conditions associated with past Rainbow Family Summer Gatherings, puts at risk the public health and safety, if minimum public health and safety regulations are not followed. In particular, as discussed in more detail later in this memorandum opinion, the evidence presented by the government shows that a serious outbreak of bacterial infection, causing a form of dysentery known as shigellosis, occurred at the 1987 Summer Gathering in North Carolina, afflicting several thousand participants and spreading to non-participants in a number of states. Although the precise cause of the outbreak cannot be ascertained, the evidence indicates that unsanitary or unhygienic practices at last year's gathering, including use of unclean water for drinking and washing, bathing in contaminated streams, failure properly to dispose of human waste and garbage, and unsanitary cooking practices, were cumulatively responsible for the shigellosis outbreak.

Although this court has previously ruled that the special use permit regulations are unconstitutional and hence unenforceable, insofar as they target protected First Amendment activity, that ruling has been appealed. If, upon appeal, the regulations are found to be constitutional, entry of a permanent injunction might be an appropriate method of enforcing the permit regulations.[2] Final injunctive relief against a public nuisance is also an appropriate remedy, and would be warranted to the extent that the upcoming gathering may pose a threat of public nuisance. *See infra,* pages 304–306. Hence, the defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole," justifying class certification under Fed.R.Civ.P. 23(b)(2).

A class of defendants shall therefore be certified under Rule 23(b)(2). The class shall be composed of the Rainbow Family and the other Rainbow defendants named in the second amended complaint; the individual defendants named in the second amended complaint; their officers, servants, employees, agents, attorneys, and all other persons acting in concert or participation with them; as well as any other person attending, or planning to attend, the 1988 Rainbow Family Summer Gathering within the National Forests of the State of Texas, who receives notice of this order, by personal service or otherwise. The class representatives shall be the individual defendants who have appeared one or more times before this court: Stephen Principle (also known as Stephen Sedlardo); Holly Lynn (also known as Lynn Nix); "Electric Ed"; "Bible Bob"; "Water–Singing–on–the–Rocks" (also known as Allan Feldman); Barry Adams (also known as "Plunker"); "Little White Owl"; "Mother Nature"; "Jaydeen"; "Iris Spring Flower"; and "Puma" (also known as David Kennison). Larry Daves, Esquire, of Tyler, Texas, shall be appointed as counsel for the defendant class.

### III. FINAL INJUNCTION

Unlike a preliminary injunction, which is intended to preserve the *status quo* pending resolution of the issues, a permanent or final injunction is to be granted only after a right thereto has been established at a full trial on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 396, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Shanks v. City of Dallas,* 752 F.2d 1092 (5th Cir. 1985); 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2941 (1973). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, in that the plaintiff must show the existence of a substantial threat of irreparable harm, that outweighs any harm the relief would accord to the defendants, that there is no adequate remedy at law, and that granting the injunction will not disserve the public interest. *See Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988

---

**2.** No ruling is intended, at this stage, on whether or not the permit regulations could be enforced by injunctive relief; rather, the statement in the text merely acknowledges this possibility.

(1959); *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985); *Tubwell v. Griffith*, 742 F.2d 250, 251 (5th Cir.1984). To justify a permanent injunction, however, the plaintiff must demonstrate actual success on the merits, rather than a likelihood of success. *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987). It is within the court's sound discretion to decide whether to exercise equity jurisdiction and grant permanent injunctive relief. *Lemon v. Kurtzman*, 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469–70, 36 L.Ed.2d 151 (1973). "Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *Holland America Insurance Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.1985). Speculative injury is not sufficient, for "there must be more than a mere possibility or fear that the injury will occur." *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931); *Holland*, 777 F.2d at 997. If warranted, permanent injunctive relief is a "flexible" remedy, "to be molded to the necessities of a particular case." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 62, 95 S.Ct. 2069, 2078, 45 L.Ed.2d 12 (1975); *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944).

The government has alleged several bases for the requested permanent injunctive relief, under both federal and state law, including: the Forest Service's special permit regulations; the Texas Mass Gatherings Act; the National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321 *et seq.;* and the equitable doctrine of public nuisance. As discussed below, however, final injunctive relief is authorized, only to the extent that the 1988 Summer Gathering constitutes a public nuisance, for the reason that it poses a threat to the public health.

*Special Use Permit Regulations*

■ The government's demand for a permanent injunction, because the defendants have failed to secure a "special use permit," in advance, under Forest Service regulations, must be denied. The government previously contended that the planned gathering is a "special event … for the purpose of exchange of views or judgments," for which a permit must first be obtained. *See* 36 C.F.R. § 251.51(1) (1987). That contention has already been addressed, and the permit regulations have been declared invalid (insofar as the May 10, 1988 interim rule amending the regulations is concerned), or unconstitutional (in that the regulations require a permit for events defined solely in terms of expressive activity). *See* Order at 302–313.

■ Now, however, in its second amended complaint, the government is claiming that "competition, entertainment, or training" will be present at the 1988 Summer Gathering, thus requiring the defendants to obtain a special use permit for a "recreation event," under provisions of the regulations which have not been declared invalid or unconstitutional. *See* 36 C.F.R. § 251.50(i) (defining "recreation event" as involving "competition, entertainment, or training"); Order at 312–313. The government has made no showing that "competition" or "training" will be involved in the 1988 Summer Gathering, or any other gathering of defendants for which a special use permit would purportedly be required. The evidence in the record does reflect, however, that "entertainment" undoubtedly would be present. Videotapes introduced by both parties reflected that past gatherings have involved, for instance, music, dancing, exhibitions, and similar activities. In addition, witnesses testified that the gatherings have a "carnival" or "festival" atmosphere, and the videotapes corraborated this.

By the same token, however, the record equally demonstrates that the Rainbow Family Summer Gatherings are held—at least to a significant extent—"for the purpose of exchange of views or judgments." For instance, witnesses testified—again with corroboration from the videotapes— that the gatherings are an important forum for the exchange of views among participants on many issues pertaining to politics

and religion, alternative lifestyles, and self-expression. Credible testimony was also given that many participants view the Summer Gatherings as, themselves, a form of political statement that "consensual democracy"—in which all persons who desire can participate in any decision, and can block any decision by their own vote—is a workable alternative to "representative democracy," even among large groups; as a way of encouraging world peace and ecology; as a demonstration against foreign policies in Latin America and elsewhere; and as a way of worshipping, in common, and giving expression to various religious tenets. Thus, the 1988 Summer Gathering would qualify as a "special event" under the definitions provided in the special use permit regulations, even if it could also be defined as a "recreation event."

In such an instance, when an event will include *both* "entertainment" and "expression or exchange of views and judgments," the permit regulations provide no criteria or guidance, whatsoever, as to whether the event will be deemed to be either a "recreation event" or a "special event." Neither do the regulations provide guidance relating to the standards that will be applied in such instances for issuance or denial of a permit. In the absence of any regulatory standards or criteria, a Forest Service decision-maker has unbridled discretion to term one event a "recreation event" and another a "special event," and to apply different standards for denial or approval of a permit, even though both might contain elements of recreation and expressive activity. This unbridled discretion to choose the regulatory standard to apply in any particular instance may allow the decision-maker to discriminate between groups applying for a permit, based upon his or her subjective biases. The "very possibility of abuse" will invalidate a regulation requiring a permit for expressive activity, *Niemotko v. Maryland*, 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). Thus, this discretion to define events as being for "recreation" or otherwise further reflects the constitutional infirmities of the permit regulatory scheme previously identified in the June 1, 1988 order. *See* Order at 306–

313; *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Hence, although the government now urges that the 1988 Summer Gathering is a "recreation event" for which a special use permit is required, the lack of precise standards in the permit regulations to govern the Forest Service's discretion in denying or approving a permit application for an event involving significant expressive activity, even if it also involves recreation, is constitutionally unsound, and cannot provide a basis for an injunction.

*National Environmental Protection Act (NEPA)*

■ Although not addressed in any of the pleadings, at the hearing on the plaintiff's motion for a permanent injunction the government also raised the argument that, without injunctive relief, the Forest Service would be unable to comply with its "obligations" under the National Environmental Protection Act (NEPA), 42 U.S.C. § 4321 *et seq.* The government did not elaborate on this contention; the thrust of the argument, however, appears to be that NEPA requires the Forest Service to evaluate, in advance, the environmental consequences of proposed activities in the National Forests, and to prevent actions which would have adverse impacts. Normally, according to the contentions of the Forest Service, this would be done through the special use permit application process; but since the permit regulations have been held invalid here, its only remedy is through an injunction delaying the gathering until such time as the necessary environmental analysis has been completed.

NEPA mandates that federal agencies prepare an environmental analysis on "proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *Andrus v. Sierra Club*, 442 U.S. 347, 355–56, 99 S.Ct. 2335, 2339–40, 60 L.Ed.2d 943 (1979); *Foundation on Economic Trends v. Lyng*, 817 F.2d 882, 884 (D.C.Cir.1987). The Council of Environmental Quality (CEQ) has developed guidelines to implement the NEPA provisions. *See* 40 C.F.R. Part 1508 (1987). These CEQ interpreta-

tions are accorded "substantial deference" by the courts. *Andrus*, 442 U.S. at 357–58, 99 S.Ct. at 2340–41; *Lyng*, 817 F.2d at 884, n. 6. In general, under NEPA and the CEQ regulations, if a "major federal action" exists, the agency must conduct an "environmental assessment" in order to determine whether the action is likely to have "a significant impact on the human environment," *see* 40 C.R.F. §§ 1508.9 & 1508.-13; and if such a "significant impact" is determined to be likely, then a full-blown "environmental impact statement" must be prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.

The CEQ regulations define "major federal actions" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Such actions "include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." *Id.* Examples of major Federal action, provided in the regulations, include "adoption of official policy ... [or] formal plans," "adoption of programs, such as a group of concerted actions to implement a specific policy or plan," and "approval of specific projects, such as construction or management activities located in a defined geographic area." Such projects also include "actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(1)–(4).

The regulations, however, specifically exempt from the definition of "major Federal action" any "bringing [of] judicial or administrative civil or criminal enforcement actions." In other words, it is not a "major Federal action" under NEPA, requiring environmental analysis, to bring a civil or criminal action to enforce Forest Service or other governmental regulations or statutes.

Under these definitions, it is highly doubtful whether there is any "major Federal action" present, requiring that the NEPA analysis be conducted in advance of the gathering. Certainly, there is no "program" or "policy" at issue. Neither is there any "approval of [a] specific project" required, since the special use permit regulations regarding "special events" have been invalidated on constitutional grounds. The actions which the government may take, and—by initiating this litigation—has taken, with respect to the 1988 Summer Gathering relate to the invocation and enforcement of other statutes and regulations regarding uses of Forest Service lands, such as the "prohibited activities" regulations at 36 C.F.R. Part 261; hence, such initiatives do not qualify as "major Federal actions," falling under the exemption for "civil or criminal enforcement actions." 40 C.F.R. § 1508.18(a).

It also is questionable whether the gathering is likely to have any "significant impact" on the environment. The government has presented no evidence that this gathering, or other similar gatherings in the past, have had any but short-term adverse environmental impacts, such as temporary contamination of streams. It is possible, of course, that a particular site chosen for the 1988 Summer Gathering could encroach upon, or threaten, an "ecologically critical area," "historical site or resource," or the "habitat of an endangered species." *See* 40 C.F.R. § 1508.17. In this respect, the government submitted evidence that there may be an impact upon archeological sites at a location formerly occupied by some Rainbow Family members at Ritter Lake, in the Davy Crockett National Forest. Whether occupation of other specific sites would raise similar concerns, and how those concerns might be remedied by imposing limitations on the gathering at that site, cannot be addressed on the present record.

Finally, while it is commendable that the Forest Service is concerned about possible adverse environmental effects, there is reason to question the government's good faith in raising this argument at this time. Forest Service witnesses testified that environmental analysis of special use permit applications is routinely performed, and that in many cases, such analysis can be completed in a very short time. In this

instance, however, the government apparently seeks complete prohibition of the gathering until such a time as it can perform an environmental analysis. It is significant, however, that Forest Service officials refused to predict how long that analysis might take, speculating that it could be up to several months. Moreover, no evidence was offered to show that such extensive environmental review has ever been required before, of this or other groups, or that any group has been denied access to a forest until after a full environmental assessment or environmental impact statement had been performed. Although NEPA is unquestionably constitutional, even an otherwise valid statute cannot be applied in a manner designed to suppress First Amendment activity, or out of hostility to a particular group. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

To hold that the government is not required, under NEPA, to perform an environmental analysis of the 1988 Summer Gathering, does not mean that it cannot undertake any review of the likely environmental effects which may occur. It is free to do so. Moreover, after specific gathering sites have been designated, if the Forest Service determines that a particular resource or location is threatened in some way, such as an ecologically critical area, the habitat of some endangered species, or an archeological site, it may demand further relief and present evidence in that relation.

*Public Nuisance*

Finally, the government contends that the 1988 Summer Gathering will pose a public nuisance in various ways: by threatening public health and safety, through the spread of communicable diseases arising from unsanitary conditions; by traffic congestion on public roads; by the prospect of disorderly conduct, public nudity, and use of illicit drugs; and through the potential damage or destruction of public lands and property. The plaintiff, therefore, demands that the gathering be permanently enjoined altogether, or that defendants be enjoined to comply with various public health and Forest Service regulations. Second Amended Complaint, at 3.

"There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.'... There is general agreement that it is incapable of any exact or comprehensive definition." W. Prosser & P. Keeton, *The Law of Torts*, § 86 at p. 616 (5th ed. 1984). A "public nuisance," such as that alleged here, "is an entirely different concept from that of a private nuisance.... The term comprehends a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort or convenience of the general public. It includes interferences with the public health...." *Id.*, § 90 at p. 643.

A demand for a permanent injunction against an alleged public nuisance requires that two inquiries be made. First, it must be determined whether the conduct complained of is, in fact, a public nuisance. If so, it must next be determined whether an injunction is the appropriate remedy; and this is an inquiry that entails balancing of the equities. *Harrisonville v. Dickey Clay Co.*, 289 U.S. 334, 337–38, 53 S.Ct. 602, 603–04, 77 L.Ed. 1208 (1933); *United States v. Reserve Mining Co.*, 380 F.Supp. 11, 54–55 (D.Minn.1974). An injunction will not issue against an alleged public nuisance where the government has an adequate remedy at law. *Younger v. Harris*, 401 U.S. 37, 43–44, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971); *Northern California Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984) (Rehnquist, then-J., sitting as Circuit Justice); *Lewis v. S.S. Baune*, 534 F.2d 1115, 1123–24 (5th Cir. 1976); 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2944 at pp. 392–402. Moreover, as an equitable remedy derived from the common law, courts will refuse to issue an injunction for an alleged public nuisance where there is already in place a comprehensive statutory or regulatory scheme concerning the com-

plained-of activities. *City of Milwaukee v. Illinois*, 451 U.S. 304, 317–24, 101 S.Ct. 1784, 1792–96, 68 L.Ed.2d 114 (1981) (hereafter *"Illinois II"*); *Williams Pipe Line Co. v. Mounds View*, 651 F.Supp. 551, 567 (D.Minn.1987).

The defendants contend, at the outset, that issuance of an injunction under these circumstances would be improper, for the reason that the government has available to it adequate remedies at law for the various alleged harms, through enforcement of federal and state statutes and U.S. Forest Service regulations that prohibit many of the types of misconduct which the government alleges are likely to occur at the 1988 Summer Gathering. *See* 16 U.S. C. § 551 & § 559 (enforcement of Forest Service regulations); 18 U.S.C. § 1853 & § 1863 (criminal penalties for trespass or unlawfully injuring trees on Forest Service property); 36 C.F.R. Part 261 (1987) (prohibited activities in National Forests). For example, the regulations forbid, in the National Forests, public nudity, disorderly conduct, use of illegal drugs, and destruction of Forest Service property, as well as creation of unsanitary conditions through improper disposal of waste or garbage. 36 C.F.R. §§ 261.4–261.14. Moreover, criminal penalties of a $500.00 fine or up to six-month imprisonment may be imposed for violation of these regulations. *Id.*, at § 261.1b; *U.S. v. Ventling*, 678 F.2d 63 (8th Cir.1982); *U.S. v. Doremus*, 658 F.Supp. 752 (D.Idaho 1987). Additionally, state and local authorities retain undiminished jurisdiction to make arrests and initiate prosecutions for any violations of the laws of the State of Texas that occur. 16 U.S.C. § 480. Arguing that this regulatory scheme is comprehensive in nature and applicable to the conduct alleged by the government, the defendants maintain that it has preempted any application of nuisance doctrines, under either state or federal law. *Illinois II, supra*, 451 U.S. 304, 101 S.Ct. 1784 (preemption of federal common law); *Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963) (preemption of state law).

The government responds that it has the inherent power to protect its own lands through an injunction, as well as the public health and safety, notwithstanding the existence of these statutes and regulations. It argues, furthermore, that its regulations will not be enforceable against the large crowd expected at the 1988 Summer Gathering, based on its experience with Rainbow Family gatherings in previous years; and that in any event the regulations and their criminal sanctions are not sufficient to remedy the irreparable harms which the 1988 Summer Gathering allegedly threatens. Accordingly, the government argues that a permanent injunction is the only adequate remedy available.

The government undoubtedly has the authority—indeed, the burden—of regulating activities on the National Forest lands, pursuant to its proprietary powers as landowner and as conservator of the lands for the public interest. *E.g., Kleppe v. New Mexico*, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34 (1976); *U.S. v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *Light v. U.S.*, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); 16 U.S.C. §§ 472 & 551; 43 U.S.C. § 1740. Where necessary to protect its proprietary interests in public lands, or where there is some other genuine interest to protect or defend, such as preserving the public health and safety, the federal government may justifiably seek equitable intervention of the courts to forestall irreparable damage or some other public nuisance. *E.g., Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201–02, 88 S.Ct. 379, 385–86, 19 L.Ed.2d 407 (1967) (removal of sunken ship in navigable waterway); *United States v. Republic Steel Corp.*, 362 U.S. 482, 492, 80 S.Ct. 884, 890, 4 L.Ed.2d 903 (1960) (injunction against waste discharges into navigable river); *In re Debs*, 158 U.S. 564 (1888) (labor injunction); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1887) (injunction against fraudulent patent to public lands); *United States v. Ray*, 423 F.2d 16 (5th Cir.1970) (injunction suit to protect coral reefs); *United States v. County Board of Arlington County*, 487 F.Supp. 137 (E.D. Va.1979) (suit to enjoin construction near

national monuments); *United States v. Atlantic–Richfield Co.*, 478 F.Supp. 1215 (D.Mont.1979) (suit to enjoin industrial discharges into atmosphere); *United States v. Brand Jewelers*, 318 F.Supp. 1293 (S.D.N.Y.1970). *See also United States v. City of Philadelphia*, 644 F.2d 187, 214–20 (3rd Cir.1980) (Gibbons, J., dissenting from order denying rehearing); *United States v. Solomon*, 563 F.2d 1121, 1126–28 (4th Cir. 1977) (reviewing cases).

The United States Supreme Court's decision in *Illinois II* does not alter this analysis, as defendants assert, but rather confirms it. The *Illinois II* decision held only that federal nuisance law is not available to abate alleged pollution of interstate waterways, because Congress "had occupied the field through the establishment of a comprehensive regulatory program," in the form of the 1972 Amendments to the Federal Water Pollution Control Act. 451 U.S. at 317, 101 S.Ct. at 1792. Where no comprehensive regulation exists, and important federal interests are at stake, there is no indication in *Illinois II* that the government may not resort to the law of public nuisances to secure equitable relief. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 22, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981); S. Bleiweiss, Environmental Regulation and the Federal Common Law of Nuisance: A Proposed Standard of Preemption, 7 *Harv. Environmental L.R.* 41, 55–58 (1983).

■ In the circumstances presented here, there is no "comprehensive regulatory program," as described in *Illinois II*. This is particularly true, by reason of the fact that the Forest Service's special use permit regulations have been held invalid in this action. The judicial act of striking down a law should not, by the same stroke, deprive the government of common law remedies it may have enjoyed prior to passage of the law. Moreover, the regulations contained in 36 C.F.R. Part 261, concerning prohibited activities in the National Forests, do not permit actions to forestall a general threat to public health, since they only provide for criminal sanctions after the fact. Where the public health or welfare is threatened, the government need not wait until after the damage has occurred in order to act, even if there happen to be criminal penalties associated with the behavior causing the threat. *U.S. v. Jalas*, 409 F.2d 358, 360 (7th Cir.1969); *People v. Laman*, 14 N.E.2d 439, 442–43, 277 N.Y. 368 (N.Y.Ct.App.1938). Thus, the government may rightly proceed on a theory of public nuisance, to remedy the irreparable harm it has alleged.

■ Having determined public nuisance law is applicable, it is necessary to determine whether the government, as the party seeking injunctive relief, has proven the likely existence of a nuisance. *Harrisonville, supra; Mississippi Power, supra*. In this regard, the evidence presented by the government credibly showed that thousands of persons attending the 1987 Rainbow Family Summer Gathering in North Carolina contracted shigellosis. This number included children, who are most susceptible to the dangers associated with the bacterial infection. Even members of the Rainbow Family admitted that the outbreak was serious. Moreover, the evidence established that many persons who never attended the gathering, but who were somehow in contact with participants carrying the infection, also contracted the dysentery (including patients at a nursing home in Pennsylvania). Although certain conditions present at the North Carolina gathering appear to have been conducive to the spread of the bacteria (heavier than usual rains, for instance), it is clear from the record that the Rainbow Family's failure to observe proper sanitary conditions, in many respects, were substantial contributing conditions to the outbreak. These omissions included their failure systematically to use boiled or chlorinated water for drinking, eating, and cleaning; improper disposal of human and solid wastes; swimming or bathing in contaminated streams; and unhygienic conditions in some communal kitchens.

■ It is equally clear from the record, however, that the gathering in North Carolina, and other past gatherings, have not

resulted in serious or irreparable harm or damage to the environment or to public property, as the government contends. For example, after the 1984 Summer Gathering in northern California, Forest Service officials themselves stated that no damage to the gathering site could be discerned, and that the land was fully capable of "multiple use" utilization by ranchers, hunters, and others within a short time after the gathering ended. Similarly, Forest Service officials testified that the North Carolina gathering site has not been irreparably damaged after last year's gathering, even though they felt that the Rainbow Family had failed adequately to clean and restore the site, as promised. Thus, the government has failed sufficiently to demonstrate the likelihood of irreparable harm to the environment or to public property as a result of the 1988 Summer Gathering, in order to justify the total exclusion of the event.

 Regarding the environment, the evidence in the record does reveal that—at the North Carolina gathering, at least—garbage was left at the gathering site, automobiles were abandoned, pit latrines were not properly closed, and rehabilitation work on the site was not done effectively. Forest Service officials testified that it is common practice to require those disturbing a location, such as for logging or drilling, to clean or repair it. Thus, a limited permanent injunction, to require the Rainbow Family to comply with reasonable re-

quirements for cleaning and rehabilitating any gathering site, will be entered.[3]

 As to the alleged nudity, disorderly conduct, or use of illicit drugs which the government alleges will occur at the gathering, it is manifest from the circumstances of this litigation that the government can—and intends to—rigidly enforce the criminal statutes applicable to such behavior. In other cases, a "general fear" that narcotics or other laws will be broken by some participants of a gathering has been held to be an insufficient basis for the issuance of an injunction against the entire gathering, particularly where, as here, the gathering is for significant expressive purposes. *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 572 (9th Cir.1984) *cert. denied* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985); *Gay Students Organization v. Bonner,* 509 F.2d 652, 662 (1st Cir.1974). Since plaintiff has an adequate remedy at law for any feared criminal violations, no injunction is warranted on these grounds.

 Finally, the plaintiff's fears that traffic congestion will occur, or that the local populace will react negatively to the influx of substantial numbers of Rainbow Family adherents, as shown by the evidence presented at the hearing, do not warrant complete abridgement of the defendants' First Amendment rights to par-

---

**3.** The government has claimed that, without a bond imposed upon the defendants, it will be impossible to ensure that they comply with an order to clean up or rehabilitate a site. The defendants argue that such a bond would be unconstitutional, infringing upon their ability to exercise First Amendment rights. That question need not be resolved now, as no bond requirement will be imposed—indeed, it is the normal practice to require the party seeking an injunction to post a bond. Fed.R.Civ.P. 65(c).

In addition, the evidence is disputed as to why the North Carolina site was not properly cleaned and restored. The government blames the Rainbow Family, charging them with being irresponsible, although Forest Service officials recognized that weather may have been a factor. The defendants accused the Forest Service of interfering with their clean-up after the gathering ended. There is also additional evidence in

the record, to the effect that the Rainbow Family has adequately cleaned and restored other gathering sites in the past, such in northern California in 1984 and Oregon in 1978. Hence, the preponderance of the evidence does not indicate that the defendants will be unable or unwilling to clean and restore any site involved in the 1988 Summer Gathering.

Second, the Summer Gatherings are annual events; and there is every indication that another gathering will occur in 1989, and in years thereafter. The defendants can surely expect the Forest Service to document any mistakes they make at this year's gathering, and attempt to use such evidence in similar legal proceedings next year. Thus, it would be in the defendants' own interests to ensure that the gathering sites occupied for the 1988 Summer Gathering are cleaned and restored as fully as possible.

ticipate in the gathering, especially since the government has made no effort to demonstrate why reasonable restrictions cannot be employed to ameliorate these conditions without wholly banning the gathering. However, the defendants plainly may not obstruct Forest Service or health officials, or law enforcement authorities, in their access into and out of any gathering site, notwithstanding a claim that it would inhibit their exercise of First Amendment liberties. *See Schneider v. State,* 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939) (even engaging in First Amendment liberties does not allow a group "to form a cordon across the street and allow no pedestrian to pass ..."); *Andree v. Ashland County,* 818 F.2d 1306 (7th Cir.1987) (concert-goers have no "reasonable expectation of privacy from prying eyes" of peace officers); *Davis v. Francois,* 395 F.2d 730, 734-35 (5th Cir.1968).[4]

Therefore, based upon the preponderance of the evidence in the record, it is found that the plaintiff has sufficiently proven the likelihood of such a threat to the public health, posed by possible unsanitary and unhygienic conditions at the 1988 Summer Gathering, as to constitute a potential public nuisance. The government has failed, however, to prove that the gathering is likely to result in irreparable harm to the environment or to public property, or that the criminal laws and federal regulations are inadequate remedies for other violations which may occur at the gathering.

■ Moreover, even if such alleged harms as traffic congestion or public nudity are likely to occur, a balancing of the equities involved leaves little doubt that the gathering cannot be entirely enjoined. It must be taken into account that a permanent injunction against the 1988 Summer Gathering, which the government seeks, would operate as a prior restraint on the defendants' exercise of First Amendment rights to speak, worship, and associate. *See supra,* page 302; Order of June 1, 1988, at 32-33. "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam) (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). Further, a prior restraint on the exercise of First Amendment liberties may only be accomplished through narrowly tailored time, place, and manner restrictions; and an outright disallowance of such expression is rarely countenanced. *Southeast Promotions, supra,* 420 U.S. at 552-58, 95 S.Ct. 1243-46; *New York Times, supra; Cox v. New Hampshire,* 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). This concern weighs heavily against granting the comprehensive exclusion of the defendants that the government demands. Moreover, in view of the lack of evidence of irreparable injury in any area other than public health, a total proscription of the gathering would be unjustified.

■ Conversely, the interests of the parties and of the public are sufficient grounds for a grant of partial permanent injunctive relief, specifically directed toward health and sanitation concerns. It is a reasonable time, place, and manner restriction to require that the defendants' First Amendment activities not threaten the public health or welfare. *Grayned v. City of Rockford,* 408 U.S. 104, 113-16, 92 S.Ct. 2294, 2301-03, 33 L.Ed.2d 222 (1972); *Kovacs v. Cooper,* 336 U.S. 77, 83, 86-87,

---

4. The government has also alleged that, as a result of its purported inability to enforce Forest Service regulations at the Rainbow Family gathering in North Carolina, citizens in the surrounding area felt that a "double standard" existed, in which regulations were enforced against themselves but not against the Rainbow Family. Other than hearsay, however, no competent evidence was presented in this regard; and, particularly, there was no showing that some lasting or irreparable impact resulted. The apparently uncompromising attitude of the government toward the defendants in this litigation would, it seems, eliminate any possible suspicion that the government is treating the Rainbow Family more favorably than local residents of East Texas.

69 S.Ct. 448, 451, 453–54, 93 L.Ed. 513 (1949); *De Jonge v. Oregon*, 299 U.S. 353, 364–65, 57 S.Ct. 255, 259–60, 81 L.Ed. 278 (1937); *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919). In requiring that the defendants observe sanitary and hygienic practices at the gathering, they will not be unduly burdened. In fact, the defendants themselves should be healthier as a result.

"Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 180, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973), *quoting Virginia Railway Co. v. System Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). However, "an order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by the constitutional mandate and the essential needs of the public order.... In other words, the order must be tailored as precisely as possible to the exact needs of the case." *Carroll v. President of Princess Anne*, 393 U.S. 175, 183–84, 89 S.Ct. 347, 352–53, 21 L.Ed.2d 325 (1968). Permanent injunctive relief, in such circumstances, "must be specific and reasonably detailed...." *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Schmidt v. Lessard*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *Gunn v. University Committee to End War*, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970).

■ Thus, the defendants will be enjoined, as a class, to comply with discrete health and sanitation provisions appropriate for an outdoor gathering of large numbers of persons, as provided in Exhibit A to the permanent injunction, entered herewith.[5] The defendants will be limited to 5,000 persons at any one gathering site, so that governmental authorities may retain sufficient control over the persons gathering at the site.[6] The defendants also will be required to establish, in advance of occupying any site, that basic health and sanitation measures will be met; and regular inspections will be required to ensure that such measures are maintained during the course of the gathering. A neutral agency, the United States Public Health Service, will be designated to inspect the gathering sites and certify that minimum health and sanitation standards are met. The Forest Service will be authorized to order the closure of any site in the event that the defendants fail to comply with the terms of the permanent injunction; but, as long as the injunction is complied with, the government may not unreasonably restrict the defendants in their access to or participation in the 1988 Rainbow Family Summer Gathering.

## PERMANENT INJUNCTION

Based upon the findings of fact and conclusions of law set forth in the Memorandum Opinion of this court, entered simultaneously herewith, the defendant class, that is, the Rainbow Family, also known as the Rainbow Nation, also known as the Rainbow Family of Living Light, also known as the Gathering of the Tribes, also known as the Rainbow Family Gathering; the Rainbow Family Vision Council; the Rainbow Family Tribal Council; the Rainbow Family

---

**5.** Expert witnesses testifying at the hearing on the motion for permanent injunction indicated that sanitary criteria required for field military encampments or for refugee camps would be appropriate for the Rainbow Family gathering in the National Forests. Hence, in conformity with F.R.Evid. 201(c) and 902(5), judicial notice is taken, *sua sponte*, that certain portions of Department of the Army Field Manual No. 21–10 (FM 21–10), Headquarters, Department of the Army, Washington, D.C., 22 December 1983, entitled *Field Hygiene and Sanitation*, and Department of the Army Training Circular No.

8–30 (TC 8–3), Headquarters, Department of the Army, Washington, D.C., 15 September 1978, entitled *Field Sanitation Team Training*, are suitable standards for sanitary measures at the Rainbow Family gathering. The standards set forth in Exhibit A to the permanent injunction are drawn from these manuals.

**6.** As the permanent injunction forbids any gathering of more than 5,000 persons, there is no need to address the government's contentions under the Texas Mass Gatherings Act.

Scout Council; Stephen Principle, also known as Steven Principle, also known as Stephen Sedlardo; "Electric Ed;" Holly Lynn, also known as Lynn Nix, also known as Holley Lynn; "Bible Bob;" Diane Temperance; Barry Adams, also known as "Plunker;" "Emmett;" Lynette Johnson; "Jaydene;" "Water–Singing–on–the–Rocks;" C.A.L.M./M.A.S.H., also known as Center for Alternative Living Medicine; the East Texas Networking Center; Michael John, also known as Eugene Earl Hector; their officers, agents, servants, employees, and attorneys; all persons acting in concert or participation with them; and all persons attending, or planning to attend, the 1988 Rainbow Family Summer Gathering, who receive actual notice of this permanent injunction by personal service or otherwise, shall be, and they are hereby, permanently enjoined:

(1) Forthwith to designate to the United States Forest Service three or more specific sites, not closer to each other than five miles, for the purposes of meeting, gathering, and camping within the National Forests of the State of Texas;

(2) To refrain from using or occupying any such designated site until such time as a representative of the United States Public Health Service shall have formally certified, in writing, that the facilities and means employed and provided, and to be employed and provided, by defendants at such site for food service sanitation, for water supply, and for the disposal of sewage, garbage, and solid waste, are in substantial compliance with the standards for food service sanitation, water supply, and waste disposal set forth herein in Exhibit A (attached hereto); provided, however, that if the United States Public Health Service Representative shall determine, in the exercise of his or her sound discretion, that the facilities and means actually employed by defendants at a designated site for food service sanitation, water supply, and waste disposal are at variance with the standards set forth in Exhibit A, but are equally as efficacious as those so specified, such existing facilities and means may be certified as substantially complying with the criteria of Exhibit A; provided, further, that up to 300 persons may immediately enter and occupy any such site, although prior to the certification of the United States Public Health Service representative heretofore mentioned, for the purpose of preparing such site for occupancy and use;

(3) To take such affirmative measures to preserve, protect, and restore the environment and ecology of any designated site and its surrounding area, as may reasonably be required by the United States Forest Service;

(4) To take such affirmative measures as may be reasonably necessary to maintain continuing substantial compliance with the standards for food service sanitation, water supply, and waste disposal as are set forth in Exhibit A; and

(5) To take affirmative measures, in conjunction with the United States Marshal for the Eastern District of Texas, or his delegates, to prevent the occupancy or use of any such designated site by more than 5,000 persons.

## ORDER

In accordance with the terms of the Permanent Injunction and the Memorandum Opinion, entered simultaneously herewith, it is ORDERED:

(1) That the plaintiff, the United States of America, by and through its Surgeon General, as director of the United States Public Health Service, or his delegate, shall assign duly qualified personnel to conduct inspections of each of the three or more sites designated by the defendants, the Rainbow Family and others, for the purposes of meeting, gathering, and camping, in advance of the occupation of such sites, to determine whether the facilities and means employed and provided, and to be employed and provided, by such defendants for food service sanitation, water supply, and disposal of sewage, garbage, and solid waste at such site are in substantial compliance with the standards set forth in Exhibit A to the Permanent Injunction, this day issued, or whether equally suitable and effective facilities and means are or will be employed and provided for the purposes

referred to at such site; and if any such site is found satisfactory in such respects, the inspecting personnel shall immediately certify such determination, in writing, to the Supervisor of the National Forests in Texas, or to his delegate.

(2) That the plaintiff, the United States of America, by and through its Supervisor of the United States Forest Service, or his delegate, and its United States Marshal for the Eastern District of Texas, or his delegate, shall immediately following the delivery to them, or their delegates, of the certificate alluded to in paragraph (1), take affirmative actions to insure that defendants have free, uninterrupted, and unobstructed access, in at least one place, to and from any such designated site, for the purposes of meeting, gathering, and camping; and to take any such additional steps as are reasonably necessary to assure defendants' continued free, uninterrupted, and unobstructed access, in at least one place, to and from such designated site, except (a) when a closure order is in effect, pursuant to paragraph (6), or (b) when the persons present at such designated site exceed 5,000 in number, as determined by the United States Marshal for the Eastern District of Texas, or his delegate.

(3) That the plaintiff, the United States of America, by and through its Surgeon General, or his delegate, shall appoint and require suitable and qualified inspectors of the United States Public Health Service to make periodic inspections of each of the designated sites referred to above, for so long as they are occupied by three hundred or more persons, to determine whether proper measures are being observed as to food service sanitation, water supply, and waste disposal, under the standards set forth above; such inspectors to be accompanied, in each instance, by representatives of the defendants and of the United States Forest Service, if such representatives, or either of them, so desire.

(4) That any substantial deficiencies observed by such inspector at a designated site shall be noted, in writing, and a copy thereof shall be delivered to the representatives of the defendants and the United States Forest Service accompanying him or her; and if there is no representative of the defendants, such copy shall be posted at some conspicuous place at such designated site.

(5) That the defendants shall rectify the observed deficiency or deficiencies at such designated site within twenty-four hours of the delivery of such writing to the representative of the defendants;

(6) That, if such deficiency or deficiencies are not substantially rectified at such designated site within the twenty-four hour period previously mentioned, such inspector shall certify such non-compliance to the Supervisor of the United States Forest Service in Texas, or his delegate, and to the United States Marshal for the Eastern District of Texas, or his delegate; and the Supervisor, or his delegate, may, in his discretion, thereupon issue an order of closure respecting such designated site, which shall be effective until such deficiency or deficiencies are, in the opinion of the inspector, substantially rectified; and after which time, such inspector shall immediately so notify the aforementioned Supervisor, or his delegate, and the latter shall, forthwith, set aside such order of closure and immediately notify the United States Marshal, or his delegate, of his action.

(7) That the plaintiff, the United States of America, by and through its United States Marshal for the Eastern District of Texas, or his delegate, shall ascertain when and if the persons present at any site designated by the defendants as a place for meeting, gathering, and camping equals 5,000; and if he makes such determination, he, or his delegate, shall immediately notify the Supervisor of the United States Forest Service in Texas, or his delegate, of such fact; and

(8) That the United States Marshal, or his delegate, shall thereupon take reasonable measures, of his own devising, to assure that such number of persons does not increase above 5,000 at such designated site.

EXHIBIT A

Excerpts from Department of the Army Field Manual No. 21–10 (FM 21–10),

Headquarters, Department of the Army, Washington, D.C., 22 December 1983, entitled *Field Hygiene and Sanitation*

## Section IV. Diarrhea

### PLAN FOR SAFE WATER

Know the location of approved water distribution points.

Make sure your unit has an adequate supply of—

- Iodine water purification tablets (1 bottle for each individual).

- Chlorination kits.

- Bulk chlorine.

Inspect water containers before use.

Check the chlorine residual of water supplies before drinking.

**55**

### PLAN FOR SAFE FOOD

Insure food service personnel maintain foods at safe temperatures.

Inspect food service personnel daily and refer for medical evaluation those with illness and/or skin infections.

Make sure foods, drinks, and ice purchased from civilian vendors are approved by command medical authority.

Supervise the use of the messkit laundry.

Insure food service personnel have and use handwashing devices.

Insure all food waste is buried or burned daily (at least 30 yards from food preparation area).

# PLAN FOR THE CONSTRUCTION AND MAINTENANCE OF FIELD SANITATION DEVICES

Select locations for field latrines--

- As far from food operations as possible (100 yards or more is best).

- Away from sources of ground water wells, springs, and streams (30 yards or more is best).

Construct and maintain latrines--

- As soon as the unit moves into a new area, detail soldiers/airmen to dig straddle trench latrines. Construct at least 4 trenches per 100 males and 3 trenches per 100 females.

- Detail soldiers/airmen to maintain the latrines.

- Instruct the field sanitation team to spray the latrines with insecticide when flies are bad.

57

- Always provide handwashing facilities at the latrines.

Make use of handwashing devices at latrines mandatory.

Bury waste daily.

58

## IN THE FIELD WHEN FOOD IS BROUGHT TO YOUR UNIT

STEP 1:

Check the preparation of insulated (Mermite) containers.

For hot foods the container should be preheated by the use of boiling water. Foods should be placed in the container while they are hot (above 140°F). For cold foods the container should be prechilled by the use of ice. Foods placed in the container should be cooler than 45°F.

---

NOTE

See FM 10-23 for the correct procedures for preparation of insulated containers.

STEP 2:

When the insulated container arrives have the supervisor check the temperature before serving. Make sure it is 140°F or above for hot foods and 45°F or below for cold foods.

NOTE

If potentially hazardous food do not meet this requirement, the unit medical authority should advise the unit commander on the use or disposal of the food.

STEP 3:

Check for handwashing devices for use by soldiers.

STEP 4:

Check the messkit laundry. Make sure soldiers are using the scrap can before washing messkit.

NOTE

If immersion heaters are not in use, food service disinfectant may be used. Check to see if the label directions are being followed.

SCRAP CAN HOT SOAPY WATER (150°F) CLEAR BOILING WATER CLEAR BOILING WATER

**87**

---

TASK 4: Inspect water containers.

EQUIPMENT NEEDED: None

WHEN TO INSPECT WATER CONTAINERS:

Quarterly in garrison when not being used.

Before filling at water distribution points.

STEPS OF PERFORMANCE:

UNIT WATER TRAILER:

QUARTERLY:

STEP 1: Manhole cover: Make sure the sealing gasket is in place, free of excessive cracks and dry rot. Cover should provide effective seal.

STEP 2: Drain plug: Make sure it is operable--it should be removable without excessive effort.

88

STEP 3: Interior: Check surface for excessive cracks; check for signs of being used for storage of products other than water (oil products, gasoline, etc.). Rust stains and other discoloration caused by common natural chemicals in water (iron, manganese) pose no health problem.

STEP 4: Spigots: Make sure spigots are clean and operable. Covers over spigots should open and close with ease. Spigot handles should operate freely.

NOTE

Questions concerning excessive interior cracks or chipping and use after storage of products other than water should be directed to preventive medicine. Refer to TM 9-2330-267-14 & P (maintenance manual for 400 gallon water trailer) for maintenance instructions.

89

BEFORE FILLING AT WATER
DISTRIBUTION POINTS:

STEP 1: Check interior for gross contamination.

STEP 2: Check hose used to fill trailer. Water point fill hose should not come in contact with the ground. If the hose is lying on the ground, wash the end before use.

STEP 3: After filling, check manhole cover to make sure it is secure.

---

**CAUTION**

Personnel detailed to fill water trailers must be directed to fill trailers only at approved water points.

---

LYSTER BAGS:

STEP 1: Interior: Check for dirt and other contamination; check for holes.

STEP 2: Cover: Check to make sure it fits. Check for holes.

STEP 3: Spigots: Make sure spigots are clean and inplace.

WATER CANS: Check interior for contamination; if can has an odor of gasoline, do not use for drinking water.

TASK 5. Check unit water supply for chlorine residual.

EQUIPMENT NEEDED: Chlorination kit containing 3 color comparison tubes with color bands and bottle of chlorine test tablets.

Check the chlorine residual when:

Filling unit containers at water distribution points.

Water containers arrive in unit area.

Directed by command medical authority.

Treating a raw water supply.

STEPS OF PERFORMANCE:

STEP 1: Determine the desired chlorine residual in parts per million (ppm).

At the point of consumption, the supplies from a water distribution point should have at least 1 ppm chlorine residual.

When the unit must disinfect a raw water supply, the finished product should have a 5 or 10 ppm chlorine residual as directed by medical authority.

STEP 2: Select the desired color comparison tube (marked 1, 5, or 10) based on the desired chlorine residual from STEP 1.

STEP 3: Place one test tablet in the color comparison tube cap and crush it with the bottom of the test tablet bottle. Put the crushed tablet into the color comparison tube.

STEP 4: Flush the spigots of the water container being checked and fill the tube to a point just below the color band.

STEP 5: Place the cap on the color comparison tube and shake until the test tablet is completely dissolved.

93

STEP 6: Compare the color shade of the water with the color band on the comparison tube.

The water is safe to use if the color of the water is the same shade or darker than the color band on the tube.

The water must be chlorinated if the color is lighter than the color band on the tube (see TASK 6).

TASK 6: Chlorinate unit water supplies.

EQUIPMENT NEEDED: Chlorination Kit, 6 oz jar of calcium hypochloride (70% chlorine).

Chlorinate the unit water supply when:

Water supply has no chlorine residual.

Chlorine residual is below required level.

Raw (untreated) water supply must be used.

STEPS OF PERFORMANCE:

STEP 1: Before adding chlorine, check the chlorine residual following procedures in TASK 5.

95

STEP 2:

If the chlorine residual is less than the desired level, add enough chlorine to raise the residual to <u>5</u> ppm. Use the chart below to determine the amount to add. If a 10 ppm chlorine residual is required, double these amounts.

<u>Container size</u>

<u>Amount to add</u>

1 ampule

5 gallons

3 ampules

36 gallons

400 gallons

1 messkit spoonful of calcium hypochloride

97

STEP 3: Wait 10 minutes, then check the chlorine residual.

STEP 4: If the residual is less than 5 ppm, repeat steps 2 and 3.

STEP 5: If the residual is at least 5 ppm, wait an additional 20 minutes before drinking.

TASK 7: Construct and maintain field waste disposal devices.

EQUIPMENT NEEDED: Personnel detailed to construct and maintain latrines and disposal devices. Material as required for type of facilities to be constructed.

FIELD METHODS OF DISPOSAL THAT MAY BE USED ARE–

 Garbage/rubbish disposal.

---

 Burial.

 Incineration.

 Liquid kitchen or bathing waste disposal.

 Soakage pits.

 Soakage trenches.

 Evaporation beds.

 Human waste disposal.

 Cat-hole latrine for marches.

 Straddle trench for 1-3 day bivouac sites.

 Deep pit latrine for temporary camps.

 Burn-out latrine or pail-latrine when the ground is too hard or the water table is too high (soil is very wet).

---

Soakage pits for urinals at temporary camps:

Trough urinal.

Pipe urinal.

**100**

---

Excerpts from Department of the Army Training Circular No. 8–30 (TC 8–3), Headquarters, Department of the Army, Washington, D.C., 15 September 1978, entitled *Field Sanitation Team Training*

**2–10. Treatment of Water.** *a. General.* The objective of water treatment is to produce potable water. The treatment processes used in the field are the same as those commonly used in civilian water treatment. These include, but are not limited to, *coagulation and sedimentation* to remove turbidity, *filtration* to remove the remaining turbidity and a large portion of the pathogenic organisms, and *disinfection* to kill any disease-producing organisms which have not been removed by sedimentation and filtration. Water coagulation, sedimentation, and filtration are not discussed here, as these are specialized operations performed by the engineers.

*b. Disinfectant.* Chlorine is the chemical agent commonly used in purifying water for drinking and other domestic purposes. Calcium hypochlorite, which releases 70 percent of its weight as chlorine, is the compound normally utilized for water disinfection in the field. It is added to the water in the amount necessary to destroy the organisms (chlorine demand) with some remaining to serve as a continuing disinfectant (chlorine residual). Sudden disappearance of all chlorine probably indicates recontamination. A relatively small quantity of chlorine and contact time of at least 30 minutes is required for satisfactory water disinfection. Experience has proved that in most cases the major portion of the chlorine demand will be satisfied within 10 minutes after chlorine dosage is added. If the required chlorine residual (*d* below) is present after this period, an additional contact period of 20 minutes is mandatory before the water can be consumed. Under ordinary field conditions the chlorine residual required is 5 p.p.m. after a 30–minute total contact period. In areas of the world where amebic, bacterial, or viral dysentery or infectious hepatitis are problems, chlorination (disinfection) requirements recommended by the surgeon will be established by a command directive. Chlorination processes which are properly controlled do not impair the taste and odor of water and frequently improve them.

*c. Method of Disinfecting Water.*

(1) *Use of Lyster bag and calcium hypochlorite.*

(*a*) This is the most satisfactory and convenient method for disinfecting water for a small unit in the field. The Lyster bag is issued to units on the basis of 1 per 100 persons. The calcium hypochlorite is issued in ampules for handling convenience. One ampule contains 0.5 gram of calcium hypochlorite and ordinarily gives a dosage of approximately 2 p.p.m. when added to the water in the Lyster bag. As many ampules as necessary are used to provide the required 5 p.p.m. chlorine residual after a 10–minute contact period. After the desired chlorine residual is obtained, the water is allowed to stand for an additional 20 minutes before use. When a residual above 5 p.p.m. is desired, the 5 p.p.m. chlorine residual after a 10–minute contact is first obtained, then the number of ampules of calcium hypochlorite required to create the desired residual are added. The number required is based on the fact that after the initial chlorine demand is satisfied, 1 additional ampule will raise the residual

approximately 2 p.p.m. After additional chlorine has been added, a 30–minute contact period must be allowed before the water may be consumed.

(*b*) The Lyster bag must be cleaned before it is used and hung by supporting ropes before it is filled with water. The bag is cleaned with a solution made with one ampule of calcium hypochlorite dissolved in one gallon (4 liters) of water. The bag is filled only to within 4 inches (10 cm) from the top of the bag. If possible, the water should be settled and clear (perhaps even strained through a cloth) before it is poured into the Lyster bag. Before the calcium hypochlorite is added, it is first dissolved in a canteen cup with a small amount of water taken from the Lyster bag. As this mixture is poured into the Lyster bag, and the water is stirred with a clean stick; faucets are flushed with a small quantity of water. After 10 minutes the faucets are flushed again, and chlorine residual is determined. The sample must not be collected in the same cup or container used to dissolve the hypochlorite.

(2) Use of individual canteens and iodine tablets or ampules of calcium hypochlorite. This method is ordinarily used when troops are on the march or on patrol and the only source is raw water.

(*a*) The iodine purification tablet is added to a canteen (1 qt/960 ml) of water. It releases 8 p.p.m. of iodine as a disinfecting agent. This amount is more than adequate for normal water. In case of turbid or colored water, two tablets are used to insure adequate disinfection. The iodine-treated water is allowed to seep around the neck of the canteen to kill any organisms harbored there. A minimum contact time of *25* minutes is required for water disinfection using the iodine purification tablets. At the present time there is no method which can be used in the field to determine the iodine residual.

(*b*) When calcium hypochlorite is used instead of the iodine tablet, a solution is first prepared by dissolving the contents of one calcium hypochlorite ampule in one half canteen cup of water. This concentrated solution is dispensed into several canteens of water. One-half plastic canteen capful or three aluminum canteen capfuls per canteen are adequate. The chlorine-treated water is allowed to seep around the neck of the canteen to kill any organisms harbored there. A 30–minute contact time is allowed before drinking the water. Sometimes the addition of small amounts of chlorine to water causes disagreeable odors or taste to develop. If this occurs, one or more additional canteen caps of the prepared solution will usually correct the condition.

(3) *Boiling of water.* This method is used when disinfecting compounds are not available. It is not considered the best method, since there is no residual protection against recontamination. Water at a rolling boil for 15 seconds kills most of the organisms that are known to cause intestinal diseases. Care must be taken to use clean containers for boiling the water.

*d. Determination of Chlorine Residual.* The level of chlorine residual in treated water is determined by use of a comparator. A comparator consists of three plastic tubes and three vials of orthotolidine tablets which are contained in the chlorination kit with the calcium hypochlorite ampules. Each of the plastic tubes has a band of a different shade of yellow around it; the lower edge of this band is just above the halfway point of the tube. The lightest shade of yellow indicates 1 p.p.m.; the medium shade, 5 p.p.m., and the darkest shade, 10 p.p.m. These figures are printed on the tubes. One orthotolidine tablet is added to the plastic tube and crushed. The water to be tested is then added to a point just below the bottom of the yellow band. The tube is then closed and shaken. The tube should be held in the palm of the hand and kept warm to further color development. If the 5 p.p.m. tube is used, for example, and the orthotolidine reacting with the chlorine produces a color exactly the same as or slightly darker than yellow band, the chlorine residual is at least 5 p.p.m. If the color is lighter than

the band, the chlorine residual is less than 5 p.p.m. In this case, the contents of an additional calcium hypochlorite ampule is added to the Lyster bag (c(1) above): then the water is retested after another 10–minute period.

### Section III. FOOD SERVICE SANITATION

**2–11. Importance of Sanitary Practices in the Handling of Food.** The conditions under which food is transported, stored, prepared, and served can have a direct bearing on the success or failure of a military mission. Food contaminated with disease germs through improper or insanitary practices can result in outbreaks of foodborne diseases. All persons who handle food must maintain the highest standards of sanitation.

**2–12. Transportation of Food.** The vehicles used for transporting food must be clean and completely enclosed, if possible. Vehicles used for transporting garbage, trash, petroleum products, or similar materials, should not be used for transporting food unless the vehicles have been properly cleaned and disinfected. If bulk quantities of meat and dairy products are to be transported over a considerable distance, refrigerated containers should be used. Every unit should have clean tarpaulins, boxes, or bags to protect food from contamination. Perishable food products are stocked only at a level commensurate with the capacity of the food service storage facilities of the unit.

**2–13. Storage of Food.** Immediately upon receipt of food in the food service facility, the unit food service officer or another responsible individual inspects it. Any food suspected of being unfit for human consumption is referred to a veterinary officer or to the surgeon for his opinion.

 *a. Food Requiring Refrigeration.* Food products requiring refrigeration should be stored at a temperature of 45° F (7° C) or below. Some units have a refrigerator and a generator as part of their equipment. Each unit, however, is ordinarily issued an icebox or ice chest with a 200–pound (90 kg) capacity.

 *b. Semiperishable Food.* Vegetables such as potatoes and onions are stored in a dry place on dunnage so air can circulate around them, thus retarding decay and spoilage. Screened food boxes may be used to keep such semiperishable items as bread for a short period of time. These screened boxes are suspended to permit free circulation of air and to protect the food items from insects and rodents. The food items are covered before they are placed in the boxes to protect them from dust.

 *c. Nonperishable Food.* Nonperishable food items such as staples are stored in metal containers with tightly fitted lids and protected from excessive heat and moisture. Improper storage can result in loss from rodent or insect infestation or from deterioration because of excessive heat or moisture.

 *d. Acid Food.* Acid food and beverage such as a citrus fruit drink must never be stored or served in galvanized iron cans because they are capable of dissolving the zinc which will produce toxic zinc poisoning in the consumers.

**2–14. Physical Condition of Food Handlers.** *a.* The food handler infected with any communicable disease or is a carrier of such diseases is a source of danger. The measures taken to eliminate this danger include medical examinations, daily inspections, instructions in the maintenance of personal hygiene, and provision for adequate toilet and washing facilities and clothing. Consideration is given to the nature of the diseases prevalent among the local population before utilizing indigenous personnel in overseas food service facilities. All permanently assigned food-handling personnel, including those individuals doing routine inspection of food, are examined medically prior to assignment. Persons who have been absent from work for any length of time for reasons of communicable illness including diarrheal illness, will

be referred to the appropriate medical facility for a determination of fitness for duty prior to resuming work. Changes to this policy may be directed by the command surgeon based on local conditions.

*b.* The dining steward or other supervisor of the food-handling activities inspects all food service personnel daily at the time they report for duty and observes them throughout the work period for signs of illness. Anyone showing evidence of illness, skin disease, infected cuts, or boils is not permitted to work in the food service facility unless cleared by a medical officer. The washing of hands after visiting a latrine must become an unfailing habit.

**2–15. Cleaning and Disinfection of Utensils.** *a.* Cooking utensils are cleaned, disinfected, and stored after each use. They are scraped free of food particles, washed in hot soapy water, rinsed in boiling water, rinsed again in boiling water, and allowed to air dry. They are then stored in a clean covered place where they are protected from dust and vermin. Several types of water heaters are discussed in FM 21–10. The type most widely used is the immersion heater, M–1937, which displaces approximately 10 gallons (45 liters) of water. It is standard equipment for all TOE units.

*b.* The mess kit laundry consists of three 32–gallon (121 liter) containers which are sufficient to service 80 persons per meal. The first container is filled with hot soapy water; the other two, clear boiling water. When it is impossible to heat the water, a chlorine solution is used in the third container. Each kit is immersed in the chlorine solution for not less than one minute. The prescribed solution is one level spoonful (standard mess kit spoon) of calcium hypochlorite (70 percent available chlorine) in 10–gallons (38 liters) of water or one package of food service disinfectant, chlorine, in 25 gallons (95 liters) of water. This latter solution is usually sufficient for a dining facility serving approximately 100 men. If mess kits become soiled or contaminated between meals, they should be rewashed, as described above, prior to use.

**2–16. Physical Facilities.** The physical facilities where food is stored, prepared, and served must be free of rats, mice, flies, roaches, ants, and other vermin which contaminate food and food utensils. Screening and ratproofing methods are used to the greatest extent possible. Repairs are made as soon as the need is indicated. Food and utensils are stored in protected places. Proper waste disposal and control methods (sec IV, VI, and VII) are used to destroy arthropods and rodents and to eliminate their feeding and breeding places. When a pesticide is used, the directions on the container must be followed exactly. The use of residual pesticides in food handling areas is limited to crack and crevice treatment only. Extreme care is taken when using pesticides in the presence of food. All food and food contact surfaces must be protected during the spraying or dusting operation. Pesticides must never be stored in the food storage area.

**2–17. Preparation and Serving of Food.** *a.* The food service functions are coordinated to eliminate any unnecessary lapse of times between the preparation of the food and the serving of the meal. Every effort is made in handling the food items to keep them from becoming contaminated, since most foods furnish sufficient nutrient matter for germs to multiply and in some instances to produce large amounts of toxin. Protein foods furnish particularly good media for the growth of germs; therefore contaminated meat, milk, eggs, and cream fillings are especially hazardous. Salads, chopped meats, and sandwich fillings require considerable handling during preparation, thus increasing the opportunities for contamination. Such items are, therefore, prepared immediately before serving or placed promptly in the refrigerator after preparation. When neither course is feasible, as in the case of box lunches, protein foods are avoided unless they are of the processed or smoked type. Three hours are considered to be the safe limit for these food items to remain unrefrigerated. Since leftover food presents a serious problem, meals are planned to reduce the amount of

leftovers. Items held at unsafe temperatures will not be retained as leftovers for reuse. Prepared refrigerated items which have not been placed on the serving line may be retained no more than 24 hours. Certain types of food such as creamed pies or casseroles are not saved under any conditions.

*b.* When defrosted or dehydrated foods are exposed to moisture, they are particularly susceptible to spoilage. Dehydrated foods are used at once after reconstitution. One exception is reconstituted dehydrated milk which may be kept under good refrigeration overnight to improve the flavor and solubility of the product. After frozen foods are defrosted, they should be used promptly. The thawing of frozen meat or fruit is best accomplished slowly in a refrigerator. When this is not feasible, it is recommended that meat be defrosted by cooking. This is the preferred method for fish, prepared poultry, and vegetables except leafy greens and corn. In arctic operations where fresh vegetables are transported in a frozen state, they should be used quickly after they are thawed and never refrozen.

*c.* Proper methods of preparation may reduce certain types of food contamination without impairing the nutritive value of the food. Meat, for example, may contain disease-producing agents that cannot be detected by inspection. Cooking procedures must be such to insure that heat penetrates to the center of the meat and that all of the meat is well cooked. Personnel must be educated to the fact that pork which is pink has not been sufficiently cooked. All fruits and vegetables are washed before use to eliminate spray residues and to reduce contamination from handling. Since human excreta is used for fertilizer in many areas of the world, food products grown under this condition must not be consumed uncooked unless approval is granted. If the nutritional value of fresh fruits and vegetables cannot be provided in any other way, the surgeon may authorize the use of certain ones provided the proper precautions are taken (AR 40–5). The suspected produce is trimmed, scrubbed, washed, and thoroughly cooked or disinfected. Before hard-skinned fruits and vegetables with intact surfaces are disinfected, they are kept out of refrigeration for 24 hours; then they are immersed for 1 minute in water at a temperature of 160° F (72° C). If chemical disinfection is used, the fruit or vegetables are first washed with potable water and soap or detergent and then disinfected by use of Disinfectant, Food Service, (NSN 6840–00–810–6396) according to packet instructions. Disinfection can also be accomplished by soaking the fruit or vegetables for 30 minutes in a 250 ppm chlorine solution prepared from three ounces (90 ml) of liquid household bleach per 5 gallons (19 liters) of potable water. After the soaking period all bactericidal solution must be washed off with potable water. Certain fruits and berries such as strawberries cannot be properly washed or readily disinfected; therefore they should not be served or eaten raw outside the United States.

**2–18. Inspection of Food Service Facilities.** Food service facility inspections are made for the purpose of identifying basic defects which could cause or spread communicable diseases, recommending corrective measures; and providing specialized information and instructions which help food service personnel to understand effective sanitation practices and the importance thereof. Defects of the most serious nature include the use of unsanitary food handling practices, poor personal hygiene, presence of arthropods and rodents, inadequate equipment, and inadequate cleaning and storage facilities. The field sanitation team can be of great assistance to the unit food service personnel in the prevention of these defects.

Section IV. WASTE DISPOSAL

**2–19. Importance of Proper Disposal of Wastes in the Prevention of Diseases.** The proper disposal of all wastes is vitally essential in preventing the spread of dis-

eases. The liquid and solid wastes produced under field conditions may amount to 100 pounds (45 kg) per person per day, especially if show facilities are available. A camp or bivouac lithout proper waste disposal methods would soon become an ideal breeding area for flies, rats, and other vermin and could result in filth-borne diseases such as dysentery (amebic and bacillary), typhoid, paratyphoid, and cholera among the troops.

**2-20. Responsibilities for the Proper Disposal of Wastes.** *a.* The unit commander is responsible for the proper disposal of wastes from his unit area. If facilities are not provided as is often the case when the unit is in the field, the unit commander must arrange for their construction and operation.

*b.* The Army Medical Department is responsible for the inspection of waste facilities and methods of operation. It may recommend changes which will aid in protecting the health and welfare of the troops.

**2-21. Methods of Waste Disposal.** There are several methods of disposal for the different kinds of wastes, which include human and animal waste, garbage, kitchen and bath liquid waste, and rubbish. The methods selected for use will depend upon the location of the unit and the military situation. Generally, wastes are buried if the environment, especially soil conditions, permits it.

**2-22. Human Waste Disposal.** *a. General.* Human waste disposal becomes a problem for both the individual and the unit in the field. During short halts when troops are on a march, each soldier uses a "cat-hole" latrine. It is dug approximately 1 foot (30 cm) deep and is completely covered and packed down after use. In temporary bivouac (1 to 3 days) the straddle trench is most likely used unless more permanent facilities are provided for the unit. When setting up a temporary camp, deep pit latrine and urine soakage pits are usually constructed. Alternate devices, which

may be used to dispose of human waste in the field, are the mound latrine and the bored-hole and pail latrines discussed in FM 21–10. As a guideline, eight percent of the male population within the command should be provided with latrines and five percent of the male population provided with urinals. Twelve percent of the female population within the command should be provided with latrines.

(1) Latrines are so constructed to prevent the contamination of food and water. They are located 100 yards from the unit food service facilities and 100 yards from any unit ground water source. For further protection latrines are not dug to the ground water level or in places where pit contents may drain into the water source. They are usually built at least 30 yards (30 m) from the border of the unit area but within reasonable distance for easy access. A drainage ditch is dug around the edges of the latrine enclosure to keep out rain and other surface water. A simple hand-washing device is installed outside each latrine enclosure. These devices should be designed to operate easily and be kept filled with water. Each individual must wash his hands after he uses the latrine.

(2) When a latrine is filled to within 1 foot (30 cm) of the ground surface or when it is to be abandoned, it is closed in the following manner. The pit contents, side walls, and ground surface for a distance of 2 feet (60 cm) from the side walls are sprayed with an approved residual-effect pesticide. The pit is then filled to the ground surface in layers, each layer being compacted. This is to prevent fly pupae from hatching and gaining access to the open air. The excess dirt is compacted over the pit to form a mound at least 1 foot (30 cm) high. The residual pesticide is again sprayed and a sign is posted with the date and the words "closed latrine."

*b. Straddle Trench Latrine.* A trench is dug 1 foot (30 cm) wide, 2½ feet (45 cm) deep, and 4 feet (120 cm) long. Two feet (60 cm) of length are allowed per person. The number of trenches each 4 feet (120 cm) long must be sufficient to serve 8

percent of the command at any time. For example, 100 soldiers would require 16 feet (480 cm) of straddle trench or four 4–foot (120 cm) long trenches. These trenches, which are constructed parallel to one another, are spaced at least 2 feet (60 cm) apart. Since there are no seats on this type of latrine, boards may be placed along both sides of the trench to provide sure footing. As the earth is removed, it is piled at one end of the trench, and a shovel or paddle is provided so that each soldier can promptly cover his excreta. Toilet paper is placed on suitable holders and protected from bad weather by a tin can or other covering. The straddle trench latrine is closed, using the same method described in *a* (2) above.

*c. Deep Pit Latrine.* The deep pit is used with the standard latrine box which is constructed (ordinarily by the using unit) in the two-, four-, or eight-seat size. The two-seat box should be 4 feet (120 cm) long; four-seat, 8 feet (240 cm) long; and eight-seat, 16 feet (480 cm) long. All boxes should be 2½ feet (75 cm) wide at the base. A unit of 100 soldiers requires eight latrine seats.

(1) The pit is dug 2 feet (60 cm) wide and either 3½, 7½, or 15½ feet (105, 225 or 465 cm) long, depending upon the size of the latrine box. This allows 3 inches (75 mm) of earth on each side of the pit to support the latrine box. The depth of the pit depends on the estimated length of time the latrine will be used. As a guide, a depth of 1 foot (30 cm) is allowed for each week of estimated use, plus 1 foot (30 cm) of depth for dirt cover. It is not generally desirable to dig the pit more than 6 feet (2 m) deep because of the danger of the walls caving in. Rock or high ground water levels may also limit the depth of the pit. In some soils supports of planking or other material may be necessary to prevent the walls from caving in.

(2) In order to prevent fly breeding and to reduce odors, it is necessary to keep the latrine box clean, the lids closed, and the cracks sealed. If a fly problem exists, they may be controlled by application of a residual pesticide. Control effects should be based upon fly surveys and pesticides applied in accordance with label directions. Pit contents should not be sprayed routinely since flies can develop resistance to pesticides used over and over. The latrine boxes and seats are scrubbed daily with soap and water. Using lime in the pit or burning out the pit contents is not effective for fly or odor control; these methods are not, therefore, recommended. Lime used in conjunction with the insecticides available to units is an ineffective control because the lime neutralizes the insecticide. The deep pit latrine is closed as described in *a* (2) above.

*d. Burn–Out Latrine.* The burn-out latrine may be provided when the soil is hard, rocky, or frozen making the digging of a deep pit latrine difficult. It is particularly suitable in areas with high water tables when digging a deep pit is impossible. The burn-out latrine should not be used when regulations prohibit open fires or air pollution. A unit of 100 soldiers requires at least 8 latrines. Personnel should urinate in a urine disposal facility rather than the burn-out latrine, as more fuel is required to burn out the liquid.

(1) An oil drum is cut in half. If the drum must be moved to another site for burning, handles should be welded to the sides of the drum for ease of carrying. A wooden seat with a flyproof, self-closing lid is placed on top of the drum.

(2) The latrine is burned out daily by adding sufficient fuel to incinerate the fecal matter. Highly volatile fuel such as JP4 should not be used because of its explosive nature. A mixture of 1 quart (1 liter) of gasoline to 5 quarts (5 liters) of diesel oil is effective, but must also be used with caution. It is convenient to have two sets of drums, one set nor use while the other set is being burned clean. If the contents are not rendered dry and odorless by one burning, they should be burned again. Any remaining ash should be buried.

*e. Mound Latrine.*

(1) This latrine may be used when a high ground water level or a rock formation near the ground surface prevents the digging of a deep pit. A dirt mound makes it possible to build a deep pit and still not extend it into the ground water or rock.

(2) A mound of earth with a top at least 6 feet (2 m) wide and 12 feet (4 m) long is formed so that a four-seat latrine box may be placed on top of it. It is made high enough to meet the pit's requirement for depth, allowing 1 foot (30 cm) from the base of the pit to the level of the ground water or rock level. The mound is formed in approximately 1 foot (30 cm) layers. The surface of each layer is compacted before adding the next layer. When the desired height is reached, the pit is then dug in the mound. Wood or other bracing may be needed to prevent the pit walls from caving in. An alternate method is to construct a latrine pit on top of the ground, using lumber, logs, corrugated sheet metal, or whatever other material is available, and to pile dirt around it and up to the brim, thus creating the mound around the latrine pit. The exact size of the base of the mound depends upon the type of soil; it should be made large to avoid a steep slope. It may be necessary to provide steps up the slope. The mound latrine is closed as described in *a* (2) above.

*f. Urine Disposal Facilities.* Urine disposal facilities should be provided for at least 5 percent of the command. This means that five pipe urinals are needed for a unit of 100 men. When trough urinals are used, 10 feet (3 m) of length should be allowed for 100 men. Urine should be drained from the urinals either into a soakage pit or into a standard pit latrine if the urinals are constructed in conjunction with it. The urine may be drained into a pit latrine through a pipe, hose, or trough. If a soakage pit is used, it should be dug 4 feet (1.2 m) square and 4 feet (1.2 m) deep and filled with rocks, flattened tin cans, bricks, broken bottles, or similar rubble.

(1) Urinal pipes, which should be at least 1 inch (25 mm) in diameter and approximately 36 inches (1 m) long, are placed at each corner of the soakage pit and, if needed, on two sides halfway between the corners. The pipes are inserted to a point 8 inches (200 mm) below the surface of the pit with the remaining 28 inches (800 mm) slanted outward above the surface. A funnel of tar paper, sheet metal, or similar material is placed in the top of each pipe and covered with a screen.

(2) A urinal trough, which is about 6 feet (2 m) long, is provided when material for its construction is more readily available than pipes. The trough is made of sheet metal or wood with either V- or U-shaped ends. If the trough is made of wood, it is lined with tar paper or metal. The legs supporting the trough are cut slightly shorter on one end where a pipe which carries the urine into the soakage pit or latrine is connected.

(3) If the urine disposal facility is located some distance from the sleeping area, a large can or pail may be placed at a convenient location for use as a urinal at night. This night urinal must be emptied into the urine disposal facility every morning and washed with soap and water.

(4) In order for the urine soakage pit to function properly, the troops must not urinate on the surface of the pit. The funnels or trough must be cleaned daily with soap and water and the funnels replaced as necessary. Oil and grease must never be poured into the pit, as they may clog it. When a urine soakage pit is to be abandoned or it becomes clogged, it is sprayed with an insecticide (residual solution) and mounded over with a 2-foot (60 cm) covering of compacted earth.

**2–23. Garbage Disposal.** Garbage is disposed of by burial or incineration. Tactical requirements must be considered in either case. The excavated soil must be concealed and smoke and flame may not be tolerated in a tactical situation. In a train-

ing situation environmental protection may rule out burning or burying and garbage will have to be collected and hauled away.

*a. Burial.* Garbage must not be buried within 100 feet (30 m) of any natural source of water, like a stream or well, used for cooking or drinking. The garbage burial area should be a reasonable distance from the kitchen to minimize problems with flies, odor, and appearance.

(1) On the march, in bivouac, or in camps of less than 1 week duration, the kitchen wastes are disposed of by burial in pits or trenches. Pits are preferred for overnight halts. They are usually dug 4 feet (1.2 m) square and 3 to 4 feet (1 to 1.2 m) deep. The pit is filled to not more than 1 foot (30 cm) from the top; then it is covered, compacted, and mounded with 1 foot (30 cm) of earth.

(2) The continuous trench is more adapted to stays of 2 days or more. This method is started by digging a trench about 2 feet (60 cm) wide, 3 to 4 feet (1 to 1.2 m) deep, and long enough to accommodate the garbage. As in the pit method the trench is filled to not more than 1 foot (30 cm) from the top. The trench is extended as required, and the excavated dirt is used to cover and mound the first deposit. This procedure is repeated daily or as often as garbage is dumped. It is a very efficient field expedient for disposing of garbage.

*b. Incineration.* In temporary camps of over 1 week, the garbage is often burned in open incinerators. Excellent types of open incinerators may be constructed from materials which are readily available in any camp area. Since incinerators will not handle wet garbage, it is necessary to separate the solid from the liquid portions of the garbage. This is done by straining the garbage with a coarse strainer such as an old bucket, salvaged can, or oil drum in which holes have been punched in the bottom. The solids remaining in the strainer are incinerated, and the liquids are poured through a grease trap (para 2–24*a* (3)) into a soakage pit. Since field incinera-

tors create an odor nuisance, they should be located at least 50 hards (50 m) downwind from the camp.

(1) *Cross trench and stack incinerator.* The cross trench and stack incinerator will effectively take care of the waste produced by an infantry company. This is an excellent dry trash incinerator. It is not too good for garbage, as wet material tends to disrupt proper draft and it does not burn easily. Two trenches, each 10 feet (3 m) long, are so constructed that they cross at right angles. The trenches slope from the surface of the ground at the ends to a depth of 18 inches (45 cm) at the intersection. A grate is made from pieces of scrap iron laid over the intersection of the trenches. A stack is made from an oil drum with both ends cut out or with one end cut out and the other end liberally punched with holes to admit draft air. A fire is built on top of the grates; and the waste is added, one shovel full at a time, on top of the fire.

(2) *Inclined plane incinerator.* The inclined plane incinerator will dispose of the garbage of an entire battalion, evacuation hospital, or other unit of similar size. Its effectiveness in combustion and the fact that it is not affected by rain or wind make it an excellent improvised device. Time and skill, however, are required in building it. A sheet metal plane is inserted through telescoped oil drums from which the ends have been removed. A loading or stoking platform is built; then one end of the plane-drum device is fastened to it, thus creating an inclined plane. A grate is positioned at the lower end of the plane, and a wood or fuel oil fire is built under the grate. After the incinerator becomes hot, drained garbage is placed on the stoking platform. As the garbage becomes dry, it is pushed down the incline in small amounts to burn. Final combustion takes place on the grate.

**2–24. Liquid Waste Disposal.** *a. Liquid Kitchen Wastes.* Liquid kitchen wastes accumulate at the rate of 1 to 5 gallons (4 to 19 liters) per man per day.

(1) *Soakage pits.* The liquid kitchen wastes are disposed of in the soil by means of soakage pits at or near the place where they are produced. A soakage pit for the disposal of kitchen wastes is constructed in the same manner as the soakage pit for the disposal of urine (para 2–22*e* ) except that it is equipped with a grease trap ((3) below). Two pits are needed for a company, so that each one can have a rest period every other day. In porous soil a soakage pit is 4 feet (1.2 m) square and 4 feet (1.2 m) deep will take care of 200 gallons (760 liters) of liquid per day. In camps of long duration each soakage pit should be given a rest period of 1 week every month. Even though precautionary measures are taken, a pit may become clogged with organic material.

(2) *Soakage trenches.* If the ground water table is high or a rock stratum is encountered near the surface, soakage trenches may be substituted for soakage pits. These trenches are extended outward from each corner of a central pit dug 2 feet (60 cm) square and 1 foot (30 cm) deep. The trenches are dug 1 foot (30 cm) wide and 6 or more feet (2 m) long. The depth is increased from 1 foot (30 cm) at the end joining the pit to 18 inches (45 cm) at the outer end. The pit and the trenches are filled with rock, flattened cans, broken bottles, or other coarse contact material. Two such units should be built for every 200 persons fed, and each unit should be used on alternate days. A grease trap ((3) below) is employed with this device.

(3) *Grease traps.* A grease trap is a necessary addition to the kitchen soakage pit and trenches ((1) and (2) above). All kitchen liquids are passed through a grease trap to remove food particles and as much grease as possible; otherwise the soakage pits become clogged and useless. There are two types of grease traps: the filter and the baffle.

(a) *Filter grease trap.* An oil drum with the top removed and the bottom perforated is filled two-thirds full with crushed rock or large gravel at the bottom, followed by gravel which has been graded to smaller sizes and then a 6–inch (15 cm) layer of sand, ashes, charcoal, or straw. The top of the drum is covered with burlap to strain out the larger pieces of debris. The burlap is removed daily, burned or buried, and replaced with a clean 'piece. The filtering material is removed at intervals of once or twice weekly and buried. The barrel is usually placed in the center of the soakage pit with the bottom of the barrel about 2 inches (5 cm) below the pit surface.

(b) Baffle grease trap. The baffle grease trap is the most effective way of removing grease. It is a watertight container divided into entrance and exit chambers by a hanging baffle, the entrance chamber having about twice the capacity of the exit one. The lower edge of the baffle hangs within 1 inch (2.5 cm) of the bottom. The outlet, a 2–inch (5 cm) pipe, is placed from 3 to 6 inches (75 to 150 mm) below the upper edge of the exit chamber. The baffle grease trap is usually placed on the ground at the side of the soakage pit with the outlet pipe extending 1 foot (30 cm) beneath the surface at the center of the pit. The liquid waste is strained of solids and debris before it goes into the entrance chamber of the trap. The strainer is filled two-thirds full with loose straw, hay, or grass. Before the grease trap is used, the chambers are filled with cool water. When the warm liquid strikes the cool water in the entrance chamber, the grease rises to the surface and is prevented by the baffle from reaching the outlet to the soakage pit. If the water is warm, proper separation of the grease will not occur. This is often the case in hot climates. The grease retained in the entrance chamber is skimmed from the surface of the water daily or as required and buried. The trap should be emptied and thoroughly scrubbed with hot, soapy water as often as necessary. The efficiency of this grease trap can be increased by constructing it with multiple baffles. Also, a series of baffle grease traps may be used.

(4) *Evaporation beds.* In a hot, dry climate where heavy clay soil prevents the

use of standard soakage pits, evaporation beds may be required. This is true in many parts of the United States. These beds actually involve the processes of evaporation, percolation, and oxidation. Sufficient beds, 8 by 10 feet (240 by 300 cm), are constructed to allow 3 square feet (2787 cm²) per person per day for kitchen waste and 2 square feet (1858 cm²) per person per day for bath waste. The beds are spaced so that the wastes can be distributed to any one of the beds. The beds are constructed by scraping off the top soil and constructing small dikes around the 8 by 10 foot (240 by 300 cm) spaces. These spaces are then spaded to a depth of 10 to 15 inches (250 to 375 mm), and the surfaces are raked into a series of ridges and depressions with the ridges approximately 6 inches (150 mm) above the depressions. These rows may be formed either lengthwise or crosswide as deemed desirable for best distribution of water. In operation, one bed is flooded during one day with liquid waste to the top of the ridges which is equivalent to an average depth over the bed of 3 inches (75 mm), and the liquid waste is allowed to evaporate and percolate for 2 days. After another day or two this bed is usually sufficiently dry for respading and reforming. The other beds are flooded on successive days, and the same sequence of events is followed. Careful attention must be given to proper rotation, maintenance, and dosage. It is also essential that the kitchen waste be run through an efficient grease trap before it is allowed to enter the evaporation beds. If these beds are used properly, they create no insect hazard and only a slight odor. There are other possible modifications of waste disposable methods, since sanitary measures must always be adapted to the situation encountered.

*b. Bath and Wash Water.* This water is disposed of in the same manner as liquid kitchen waste ((*a*) above).

**2–25. Rubbish Disposal.** Combustible rubbish is burned. Noncombustible rubbish is either buried or hauled to a suitable disposal site.